**E-FILED**
Wednesday, 06 June, 2007  04:15:31 PM
Clerk, U.S. District Court, ILCD

FILED

JUN ~ 6 2007

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07-300 **69** |
| | ) | |
| ROBERT W. JENKINS, | ) | 18 U.S.C. §1341 |
| | ) | |
| Defendant. | ) | |

**INDICTMENT**

COUNT 1

**THE GRAND JURY CHARGES**:

From on or about September 2000, through about September 2002, in the Central District
of Illinois,

**ROBERT W. JENKINS**,

did knowingly and intentionally devise and intend to devise a scheme and artifice to defraud

individuals of at least $180,000, by means of materially false and fraudulent promises and

representations, well knowing that such promises and representations were false when made,

which scheme and artifice to defraud was in substance as set forth in the following paragraphs.

**Background**

1.      At various times from about July 1998, through about June 2002, Robert W.

Jenkins ("Jenkins") was employed by MetLife Securities, Inc. ("MetLife"), and from June to

December 2002, Jenkins was employed by SWS Financial Services, Inc.  As part of these duties,

Jenkins was to advise and recommend appropriate investments to clients.

1

2.     In or about April 1992, Jenkins registered with the National Association of Securities Dealers ("NASD") as an Investment Representative. In or about December, 1999, Jenkins registered with the NASD as a General Securities Agent. With these designations, Jenkins was at all times bound by the rules and regulations surrounding the sale of securities to include: avoid self-dealing; act in the best interest of his clients; and provide complete and accurate disclosures.

**"Investment" by JP**

3.     In 1999, "JP" was the beneficiary of policies of insurance purchased through MetLife, which insured the life of "RP," who was JP's husband.

4.     RP passed away on July 30, 1999. At various time in 1999 and 2000, JP received approximately $150,000 in insurance proceeds on her deceased husband's policies.

5.     From the life insurance proceeds, and upon the advice and recommendations of Jenkins, JP purchased an annuity from MetLife which provided JP a monthly payment of approximately $1,250 per month.

6.     On or about December 2001, Jenkins met with JP and induced her to surrender the annuity. Instead, Jenkins advised JP to invest in a new investment company, which he was starting called "BTS, Inc." He also indicated to JP that he was leaving MetLife to start this company, and that if she invested with BTS, Inc., she would receive monthly income from her investment. JP's MetLife investments had declined in value and Jenkins told JP that JP would receive $1,250 per month in income on an investment of $60,000 with BTS, Inc., and further that JP's principal of $60,000 "would not be touched."

7.     Following Jenkins's advice, JP surrendered her annuity with Met Life and on

2

December 20, 2001, Met Life wrote a check to JP for $67,609.02.  Immediately thereafter, on or about December 20, 2001, JP invested her money with Jenkins and wrote a check payable to BTS Ink (sic), in the amount of $60,000.

8.     During this exchange on December 20, 2001, Jenkins presented a document entitled "Dissclosser Statement"(sic) to JP in which he falsely represented to JP that he was a "major shareholder" in BTS, Inc. when in truth and fact BTS, Inc. was not a legal entity and had no shareholders.

9.     On or about December 31, 2001, Jenkins opened a bank account at First Bankers Trust Company in Quincy, Illinois, in the name of BTS, Inc., and on which Jenkins listed himself as the only authorized signature on the account.  Jenkins provided First Bankers Trust Company with the tax identification number which pertained to "BTS Outdoors, Inc."  BTS Outdoors, Inc., was a company incorporated in the State of Illinois on July 28, 2000, and whose sole shareholders were Jenkins and one other, identified as "TL."  BTS Outdoor, Inc., had a checking account at Premier Bank in Jacksonville, Illinois.  Jenkins did not notify TL of this bank account in the name of BTS, Inc., nor did he have the permission of TL to use the corporation documents of BTS Outdoors, Inc.

10.     From on or about December 20, 2001, through on or about June 2002, Jenkins used the money "invested" by JP for personal and non-business purposes.

11.     From on or about February 2002, through June 2002, in order to make the "investment" appear legitimate, Jenkins sent checks, through the U.S. mail, to JP, in the amount of $1,250 each.  These checks, however, did not represent earnings on any investment, but

instead came from the money deposited into the BTS, Inc., account at First Bankers Trust Company.

12.    On or about June 14, 2002, at Quincy, in the Central District of Illinois,

**ROBERT W. JENKINS**,

for the purpose of executing said scheme did knowingly cause to be delivered by the United States mail, according to the direction thereon, an envelope containing check number 1026, in the amount of $1,250, which was represented to be a "return" on the "investment" in BTS, Inc., mailed from "Bob Jenkins, S.W.S. 510 Maine, Suite 718, Quincy, Illinois 62301," and mailed to JP in Barry, Illinois.

All in violation of Title 18, United States Code, Section 1341.

**THE GRAND JURY FURTHER CHARGES:**

<u>COUNT 2</u>

1.      The Grand Jury realleges and incorporates by reference the allegations contained in paragraphs 1 and 2 of Count 1 of this indictment as though fully set forth herein.

2.      In or about 1997, "TB's" husband passed away, and TB received $110,738 from her deceased husband's profit sharing retirement account.  In or about February, 2000, TB funded an Individual Retirement Account ("IRA") and a Preference Plus Variable Annuity Account with Met Life Securities with the $110,738.

3.      In or about 2000, TB also received $225,000 as a wrongful death settlement related to her deceased husband.

4.      In or about September 2000, Jenkins went to TB's residence to meet with her and "assist" her in her financial planning.  At this time, Jenkins suggested that she "invest" with BTS Outdoors, Inc.  Jenkins further told her that BTS Outdoors,  Inc. was an outdoor/hunting company that was doing well, and would prove to be a good investment.  However, Jenkins did not tell TB that BTS Outdoors, Inc., was a business owned by himself and one partner.

5.      On or about September 14, 2000, Jenkins convinced TB to "invest" $225,000 in "bonds" for BTS Outdoors, Inc.  At the time, Jenkins represented that one was a "three year" bond and another a "five-year" bond, each payable at 10% interest.

6.      On or about March 15, 2002, Jenkins induced TB to take all of the money in her MetLife IRA and Preference Plus Variable Annuity Account, and to invest it in a company called "JJ Inc." in the form of corporate "zero coupon" bonds.  In doing so, Jenkins falsely represented JJ Inc., to be a corporation which owned rental housing units in college towns and rented the

units to college students. Jenkins did not inform TB that he held an ownership interest in JJ Inc.,
much less that he was the sole owner of JJ Inc., stock, nor did Jenkins inform TB that JJ Inc., did
not own and never purchased real estate or have anything to do with renting housing units, to
college students or anyone.

7.      On or about March 15, 2002, upon the advice and recommendation of Jenkins, TB
opened a new IRA account at Farmers State Bank and Trust in Jacksonville, Illinois, and
liquidated her MetLife IRA and her Preference Plus Variable Annuity Account in the total
amount of $46,125.63.  As part of the liquidation, TB directed Farmers State Bank and Trust to
send the $46,125.63 to JJ Inc., for the purchase of zero coupon bonds.

8.      Bonds that are traded on the open market can be "rated" by three widely
recognized rating services, in order to give investors an idea of performance and risk.  In an effort
to induce TB into believing that the "bonds" for JJ, Inc., were legitimate, on or about June 27,
2002, Jenkins represented to TB that the coupon bonds of JJ Inc., were rated "BBB."  Jenkins
never sought, nor obtained, a rating of BBB on bonds of JJ Inc.

9.      Bonds sold through licensed investment professionals in general must be
registered with the United States Securities and Exchange Commission or the State jurisdictions
where sold unless the bonds are exempt from registration or sold in exempt transactions. A
transaction may be exempt if the bond is sold to an "exempt investor."  Investors may be
considered exempt if they have a certain net worth or annual income.  On or about May 5 and 10,
2003, Jenkins faxed and mailed a copy of a "Disclosure Statement" regarding this transaction, to
the NASD.  On this "disclosure statement" (which Jenkins captioned "discloeser and suitibility
agreement" [sic]), Jenkins falsely represented that TB had a net worth in excess of $1,000,000.

Jenkins also falsely represented that the "discloeser and suitibility agreement" contained the signature of TB.

10.     Instead of investing the $46,125.63 received from TB, Jenkins opened a bank account at First Bankers Trust Company, Quincy, Illinois and deposited TB's money. Jenkins did not invest TB's money in real estate but instead used the majority of TB's money for his personal expenses.  As part of Jenkins's scheme to defraud TB, Jenkins mailed a letter to Farmers State Bank, postmarked June 26, 2002, confirming the receipt of the bank check noted above, and indicated that the funds had purchased two bonds yielding 9% interest.

11.     On or about June 26, 2002, in the Central District of Illinois, Jenkins,

**ROBERT W. JENKINS**,

for the purpose of executing said scheme did knowingly cause to be delivered by the United States mail, according to the direction thereon, an envelope containing a letter confirming the receipt of the bank check noted above, in the amount of $46,125.63, mailed from JJ of West Central Inc., 2165 E. 1850th Street, Mendon, Illinois, 62351, and mailed to the Farmers State Bank and Trust Company in Jacksonville, Illinois.

All in violation of Title 18, United States Code, Section 1341.

**THE GRAND JURY FURTHER CHARGES:**

## COUNT 3

1.      The Grand Jury realleges and incorporates by reference the allegations contained in paragraphs 1 and 2 of Count 1 of this indictment as though fully set forth herein.

2.      "EC" and his wife "MC" were customers of MetLife at the time Jenkins was employed with MetLife.  Acting upon the "advice" of Jenkins, on February 3, 2000, EC and MC transferred their life savings of $115,000 from First Variable Life Insurance Company into a Preference Plus variable annuity with MetLife sold to them by Jenkins.  EC received $500 monthly from the MetLife variable annuity.

3.      In or about April of 2002, Jenkins induced EC and MC to transfer ownership of the MetLife annuity to "JJ of West Central ILL, Inc."  In doing so, Jenkins falsely represented to EC and MC that JJ was a builder who constructed small commercial buildings.  According to Jenkins, JJ would pay EC $321.29 monthly more than the $500 EC was receiving on the MetLife annuity, but EC and MC had to transfer ownership of the MetLife annuity into JJ's name.  Jenkins further falsely represented that the transfer of ownership of the annuity would name the builder as the owner of the annuity on paper, but that the principal of the annuity funds would not be used and in three years ownership of the annuity would be transferred back into the names of EC and MC.  At the time of this inducement, Jenkins did not inform EC and MC that he, Jenkins, was the sole owner of JJ of West Central ILL, Inc. and that there was no such builder seeking ownership of the annuity.

4.      On or about April 22, 2002, at Jenkins's direction, EC and MC signed a MetLife change of ownership form which transferred the ownership of this annuity to "JJ of West Central ILL, Inc."

5.      On or about April 24, 2002, Jenkins faxed the Annuity Change of Ownership form to MetLife to process the change of ownership.

6.      On or about April 29, 2002, Jenkins faxed to MetLife a Statement of Understanding purportedly signed by EC and MC which provided that a 1099R would be issued to EC and MC, and that they wanted to proceed with the ownership change.

7.      On or about May 3, 2002, Jenkins executed and faxed to MetLife an annuity withdrawal request for $60,000 to be paid to JJ of West Central ILL, Inc. MetLife issued and sent a check in the amount of $60,000 to JJ of West Central ILL, Inc.

8.      In or about early May of 2002, EC and MC received a letter from MetLife dated April 29, 2002, describing potential tax consequences relating to the transfer of ownership with a "Statement of Understanding" enclosed.

9.      On or about May 6, 2002, EC and MC executed and sent the "Statement of Understanding" to MetLife, which instructed MetLife not to proceed with the transfer of ownership of the annuity. However, because Jenkins had previously sent in the order for transfer, the ownership transfer had already been processed.

10.     On or about May 7, 2002, Jenkins received the $60,000 from the EC and MC annuity, and immediately deposited it into his JJ, Inc., account at First Bankers Trust Company.

11.     From on or about May 7, 2002, through on or about September 2002, Jenkins used all of the funds received from EC's and MC's annuities for his own personal expenses.

9

12.     On or about May 30, 2002, EC and MC told Jenkins that the money had been transferred against their direction, and that they wanted their money back from JJ. At that time, Jenkins falsely reported to EC and MC that he had tried to talk to the builder, JJ, about EC and MC changing their mind and not wanting to transfer ownership of the annuity, but that the builder would not talk to Jenkins. At that time, Jenkins told EC and MC that he would take over their transaction with the builder, collect the $500 monthly annuity payment from MetLife and the $321.29 from the builder and pay the funds to EC and MC. Jenkins gave EC and MC a "statement" purporting to show that transaction with the builder would be transferred to him, and also a "Promissory Note" dated May 30, 2002.

13.     On or about June 25, 2002, Jenkins faxed to MetLife an annuity withdrawal request for the remaining balance of the annuity belonging to EC and MC, leaving only the minimum to be retained to keep the annuity in force.

14.     On or about June 26, 2002, MetLife issued and sent a check in the amount of $25,514.62 payable to JJ of West Central ILL, Inc.

15.     On July 3, 2002, Jenkins deposited the $25,514.62 check for withdrawal of annuity funds in the JJ, Inc. account at First Bankers Trust Company. Upon deposit of the proceeds Jenkins used the funds for personal expenses.

16.     On or about June 26, 2002, in the Central District of Illinois,

**ROBERT W. JENKINS,**

for the purpose of executing said scheme did knowingly cause to be delivered by the United States mail, according to the direction thereon, an envelope from MetLife containing a check in

the amount of $25,514.62 to JJ of West Central ILL, Inc., 2165 E 1850th ST, Mendon, IL, 62351-2920.

All in violation of Title 18, United States Code, Section 1341.

A True Bill,

# s/foreperson

Foreperson

# s/John Childress

RODGER A. HEATON
UNITED STATES ATTORNEY

PDH/GMG

11